# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,    )
           )    C.A. No.: 1806004163
    v.    )
           )
SHAHEED MATTHEWS,    )
           )
    Defendant.    )

Date Submitted: October 20, 2022
Date Decided: January 3, 2023

*Opinion and Order Upon Consideration of Defendant's Pro Se
Motion for Postconviction Relief*
**DENIED.**

Matthew Bloom, *Deputy Attorney General*, Delaware Department of Justice, 820 N. French Street, 7th Floor, Wilmington, Delaware 19801.

Shaheed Matthews, *Pro Se Defendant*, *SBI No.: 00617849*, James T. Vaughn Correctional Facility, Smyrna, Delaware 19977.

**Jones, J.**

**INTRODUCTION**

A Superior Court grand jury indicted Shaheed Matthews in connection with the death of Antoine Terry, charging him with Murder First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Possession of a Firearm by a Person Prohibited ("PFBPP"), and Purchase of Ammunition by a Person Prohibited ("PABPP"). The State later *nolle prossed* the PABPP charge[1] and severed the person-prohibited charges for separate trials.[2]

The case against Mr. Matthews proceeded to a jury trial on the Murder First Degree and PFDCF charges in April 2019.[3] The jury convicted Mr. Matthews of both counts.[4] Following the verdict, the Court held a bench trial on the severed PFBPP charge and found Mr. Matthews guilty.[5] The Court sentenced Mr. Matthews to life plus three years in prison on July 1, 2019.[6]

Mr. Matthews filed this *pro se* motion for postconviction relief on November 3, 2021. Mr. Matthews raises four grounds for relief based on ineffective assistance of trial counsel: (1) his counsel failed to motion the State to disclose pole camera footage and failed to examine the footage for exculpatory evidence; (2) against his wishes, his counsel allowed the severance of the PFBPP charge from the Murder

---

[1] *See* Docket Item ("D.I.") 19, Superior Court Criminal Docket for Case No. 1806004163.
[2] *See* Superior Court Criminal Docket for Case No. 1712016447.
[3] *See* D.I. 72.
[4] *See id.*
[5] *See* D.I. 75.
[6] *See* D.I. 87 (Sentence Order).

First Degree and PFDCF charges; (3) his counsel failed to call Detective Joshuah Smith as a witness; and (4) his counsel failed to file a motion to suppress the search and seizure of his cell phone and failed to raise the issue at trial for presentation on appeal. Additionally, Mr. Matthews raises two grounds for relief based on ineffective assistance of appellate counsel: (1) his counsel failed to raise prosecutorial misconduct; and (2) his counsel failed to raise an objection to the introduction of a reenactment video depicting the shooting. For the reasons stated below, Mr. Matthews' motion for postconviction relief is **DENIED.**

## FACTUAL BACKGROUND

The Delaware Supreme Court summarized the underlying facts of this case in its decision on direct appeal:

> At 10:42 p.m. on December 27, 2017, a resident of Briarcliff Drive in New Castle reported gunshots to police. Briarcliff Drive runs parallel to Parma Avenue, where [Antoine Terry] was eventually found. Around the same time, a Parma Avenue resident called police to report being awakened by three or four gunshots and saw from his window a large person in a grey or black hoodie pointing or extending their arm. At 12:25 a.m. on December 28, police responded to a report of someone lying on the ground on Parma Avenue. Police found Antoine Terry unresponsive with multiple gunshot wounds in the area of 245 Parma Avenue. He died from his injuries.
>
> . . . Mr. Terry was friends with Shaheed Matthews, who stayed at 227 Parma Avenue with his girlfriend, Devon Johnson. On December 27, 2017, the evening of the

3

shooting, Mr. Terry, Mr. Matthews, and Ms. Johnson exchanged text messages. Mr. Terry asked Mr. Matthews if he wanted him to "come to his crib." Mr. Matthews and Ms. Johnson were at home. Mr. Terry, Mr. Matthews, and Ms. Johnson spent the evening together at Ms. Johnson's house watching basketball. Ms. Johnson testified that Mr. Terry and Mr. Matthews left her house around 10:30 p.m., but she was upstairs at the time and did not see them leave. Around the time of the first report of gunshots, Mr. Matthews called Ms. Johnson and asked her to pick him up at a church around the corner from her house.

. . . Video cameras from the neighborhood showed two people leave 227 Parma Avenue at about 10:38 p.m., walk towards 245 Parma Avenue, stop, and fight. A video showed one man run away while the second man chased him, fired several shots, and then ran away. A video also showed that one of the two people walking out of 227 Parma Avenue appeared to be wearing a white hood and was the same person being chased by the second man firing shots. When police found Mr. Terry, he was wearing a black puffy jacket, white hood, white pants, and pants around his knees.

. . . The police interviewed Mr. Matthews on December 28, 2017. He first denied having a cell phone, then admitted he had one, but he gave police the wrong number. Mr. Matthews eventually surrendered his cell phone to police. The police recovered internet search history and a text message thread from Mr. Matthews' cell phone revealing that he was looking to purchase a firearm just days prior to the fatal shooting on December 27, 2017.

. . . The State's ballistics report was inconclusive as to the specific type of firearm used to kill Mr. Terry. The police did not recover the murder weapon. The jacket police seized from Mr. Matthews when they arrested him tested

4

positive for gunshot residue on the right cuff.[7]

## PROCEDURAL HISTORY

Mr. Matthews appealed his conviction to the Delaware Supreme Court.[8] On appeal, Mr. Matthews challenged the admission of internet searches and text messages extracted from his cell phone that suggested he was shopping for a firearm in the days leading up to the murder.[9] He reasoned the evidence was irrelevant because the State failed to establish a nexus between the possible purchase and the actual gun used in the murder.[10] The Supreme Court rejected this argument, finding the evidence relevant "to show Matthews' motive and plan to kill Terry."[11] The Court affirmed the judgment on November 9, 2020[12] and issued its mandate on December 2, 2020.[13] Mr. Matthews timely filed this, his first motion for postconviction relief pursuant to Superior Court Criminal Rule 61, on November 3, 2021. The Court offered Mr. Matthews postconviction counsel for this proceeding. Mr. Matthews specifically requested to proceed *pro se* in response.[14]

Under Rule 61(g)(2) and *Horne v. State*,[15] the Court directed both trial and appellate counsel to submit affidavits to be considered as part of the record. As

---

[7] *Matthews v. State*, 2020 WL 6557577, at *1-2 (Del. Nov. 9, 2020).
[8] *See id.* at *2.
[9] *See id.*
[10] *See id.*
[11] *See id.* at *3.
[12] *See id.*
[13] *See* D.I. 100.
[14] *See* D.I. 104.
[15] 887 A.2d 973, 975 (Del. 2005).

5

contemplated by Rule 61(f)(1)[16] and (g)(3),[17] the Court directed the State to respond, and, consistent with Rule 61(f)(3) and (g)(3), the Court gave Mr. Matthews leave to reply to the lawyers' and the State's submissions. Former trial counsel filed an affidavit on May 23, 2022,[18] and former appellate counsel filed his affidavit on August 4, 2022.[19] The State filed a response on August 26, 2022. Mr. Matthews replied via handwritten memorandum on October 20, 2022.

## STANDARD OF REVIEW

Before addressing the merits of any postconviction claim, the Court must first determine whether the claims pass through the procedural filters of Rule 61.[20] This Court will not address the substantive aspects of Mr. Matthews' claims if the claims are procedurally barred.[21] Rule 61 imposes four procedural requirements on Mr. Matthews' motion: (1) the motion must be filed within one year of a final order of conviction; (2) any basis for relief must have been previously asserted in any prior postconviction proceedings; (3) any basis for relief must have been asserted at trial or on direct appeal as required by court rules; and (4) any basis for relief must not have been formerly adjudicated in any proceeding. Under Rule 61(i)(5), a defendant may avoid the first three procedural imperatives if the claim is jurisdictional or is a

---

[16] Super. Ct. Crim. R. 61(f)(1).
[17] Super. Ct. Crim. R. 61(g)(3).
[18] *See* D.I. 110 (Hereinafter "Trial Counsel Aff.", May 23, 2022).
[19] *See* D.I. 111 (Hereinafter "Appellate Counsel Aff.", Aug. 4, 2022).
[20] *See Younger v. State*, 580 A.2d 552, 554 (Del. 1990) ("This Court applies the rules governing procedural requirements before giving consideration to the merits of the underlying claim for postconviction relief.").
[21] *See id.*

6

"colorable claim that there was a miscarriage of justice because of a constitutional violation."[22] Further, challenges based on ineffective assistance of counsel may only be raised during a defendant's first Rule 61 proceeding.[23] Upon review, the Court is satisfied Mr. Matthews' motion is timely and procedurally proper.

Ineffective assistance of counsel claims are governed by the two-prong test set forth in *Strickland v. Washington*.[24] The *Strickland* test requires the defendant to prove "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[25] Evaluating counsel's conduct begins with a "strong presumption" the representation was reasonable.[26] This presumption is meant to avoid the "distorting effects of hindsight."[27]

## ANALYSIS

As noted *supra*, Mr. Matthews presents six (6) arguments in support of his motion for postconviction relief. The Court will take each in turn.

### A. The Ineffective Assistance Claims Against Trial Counsel

---

[22] Super. Ct. Crim. R. 61(i)(5).

[23] *See Wing v. State*, 690 A.2d 921, 923 (Del. 1996).

[24] *See Albury v. State*, 551 A.2d 53 (Del. 1988).

[25] *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Per *Strickland*, the Court is to begin its analysis under the strong presumption that the conduct of defense counsel constituted sound trial strategy. *See id.* at 689.

[26] *Albury*, 551 A.2d at 59.

[27] *Id.* at 60. The *Strickland* Court explained that an error by trial counsel, even if professionally unreasonable, does not warrant setting aside the judgment of conviction if the error had no effect on the judgment. *See Strickland*, 466 U.S. at 691.

### a. Trial Counsel Did Not Fail to Disclose or Investigate the Pole-Camera Video

Mr. Matthews first claims his trial counsel was ineffective for failing to share a pole-camera video with him before trial and not investigating the video further.[28]

At trial, the State submitted Mr. Terry's shooting occurred outside 241 Parma Avenue, between the intersection of Ms. Johnson's residence at 227 Parma Avenue and Bizarre Drive. To corroborate this claim, the State introduced footage from: (1) a home surveillance camera at 19 Briarcliff Drive, which captured the area in front of Ms. Johnson's residence; (2) a home surveillance camera at 241 Parma Avenue, which captured the shooting from behind; and (3) a New Castle County Police pole camera, which captured the intersection of Parma Avenue and Bizarre Drive.[29]

All told, the 19 Briarcliff footage showed two people[30] exit Ms. Johnson's residence and walk southeast on Parma Avenue towards Bizarre Drive.[31] Approximately seven seconds later, the 241 Parma video captured someone chasing Mr. Terry on Parma Avenue, shooting him, and fleeing in a northeasterly direction.[32] A few minutes after the shooting, Mr. Matthews called Ms. Johnson and asked her

---

[28] *See* D.I. 101. Mr. Matthews' filing is a single docket entry, but consists of three documents: a cover letter, a motion on the form provided by the Court, and a handwritten memorandum of law in support of the motion. Mr. Matthews explains all his grounds for postconviction relief in the supporting memorandum. Thus, when citing to Mr. Matthews' arguments, the Court will refer to the memorandum using the abbreviation "Matthews Mem."

[29] *See* Trial Tr. 27-29, Apr. 10, 2019.

[30] The footage allegedly depicted Mr. Matthews and Mr. Terry.

[31] *See* Trial Tr. 18-23, Apr. 10, 2019.

[32] *See* Trial Tr. 19-23, Apr. 10, 2019.

to pick him up at a church a few blocks northeast of the shooting scene.[33]
Subsequently, the 19 Briarcliff camera captured one person (apparently Ms. Johnson) leave Ms. Johnson's residence.[34] Ms. Johnson's vehicle then traveled toward the church.

Ms. Johnson testified she picked up Mr. Matthews at the church and took him to the home of his sister, Channelle Brooks.[35] After visiting with Ms. Brooks, Ms. Johnson stated she and Mr. Matthews returned to the Parma Avenue residence together.[36] According to Ms. Johnson, Ms. Brooks' car was parked in front of the Parma Avenue residence when they arrived at Parma Avenue.[37]

Ms. Brooks, however, told police a different story. According to her version of events, she parked her car in front of her residence and Ms. Johnson dropped off Mr. Matthews to borrow it.

Ultimately, the pole-camera footage captured Ms. Johnson's vehicle turn into the Parma Avenue residence at 11:31 p.m.[38] Twenty-six minutes later, the camera depicted Ms. Brooks's vehicle turn into Parma Avenue at 11:57 p.m.[39] The State interpreted the video as showing Ms. Johnson and Mr. Matthews return to the

---

[33] *See* Trial Tr. 121-22, Apr. 10, 2019.
[34] *See* Trial Tr. 24-25, Apr. 10, 2019.
[35] *See* Trial Tr. 137, Apr. 10, 2019.
[36] *See* Trial Tr. 139-40, Apr. 10, 2019.
[37] *See id.*
[38] *See* Trial Tr. 30, Apr. 10, 2019.
[39] *See id.*

9

residence at different times in different cars, thereby corroborating Ms. Brooks's statement to police.[40] At trial, the State argued this discrepancy in testimony was one of several instances in which Ms. Johnson attempted to mislead investigators.[41]

Mr. Matthews, unsurprisingly, has a different view of the facts. He claims the pole-camera video is a "zoomed in version" of the footage and the unaltered video would have revealed: (1) he returned with Ms. Johnson in her vehicle, consistent with her testimony, and (2) his clothing did not match the clothing worn by the shooter.[42] If trial counsel had shared the unedited video with him prior to trial, Mr. Matthews submits he could have excluded a separate reenactment video of the shooting,[43] had the charges against him dismissed for failure to prove identity, and "raised serious questions of malicious prosecution."[44]

Upon careful review, the Court is satisfied trial counsel did not perform deficiently in this regard. For one, trial counsel obtained the video in discovery, reviewed it with Mr. Matthews, and investigated Mr. Matthews' version of events.[45] Indeed, trial counsel received "special permission" from the Department of Corrections to bring a laptop into prison so he could review the video with Mr.

---

[40] *See* Trial Tr. 31-32, Apr. 15, 2019.
[41] *See* Trial Tr. 25-32, Apr. 15, 2019.
[42] Matthews Mem. at 3-4.
[43] The Court will address the merits of Mr. Matthews' claims related to the reenactment video later in this opinion.
[44] Matthews Mem. at 3.
[45] *See* Trial Counsel Aff. at 1-2.

10

Matthews.[46]  He even went so far as to dispatch an Office of Defense Services investigator to explore the information Mr. Matthews provided about what occurred the night of the shooting.[47]

Further, Mr. Matthews produced no evidence to support the allegation the video was "zoomed in."  To be sure, the pole-camera video provided limited coverage and the State concedes the footage was isolated for the purpose of creating trial exhibits.  Mr. Matthews, however, has failed to prove the video was otherwise edited.

The Court will not fault trial counsel for failing to obtain or utilize evidence that does not exist.[48]  Mr. Matthews' arguments about what additional footage might have shown are too speculative to demonstrate deficient performance or actual prejudice under *Strickland*.  Accordingly, this claim must be denied.

### b. Trial Counsel Was Not Deficient in Consenting to Case Severance and Failing to Impeach Detective Reid

Mr. Matthews next argues trial counsel was ineffective for consenting to sever the person-prohibited charge from the murder case.[49]  Here again, the Court finds Mr. Matthews' claim unavailing.

---

[46] Trial Counsel Aff. at 1-2.
[47] *See* Trial Counsel Aff. at 2.
[48] *See Cf. Fletcher v. State*, 2006 WL 1237088, at *2 (Del. Super. May 9, 2006) (finding defense counsel acted reasonably by not hiring firearms expert to test a gun that did not exist).
[49] *See* Matthews Mem. at 8-12.

During a search of Ms. Johnson's residence in December of 2017, police located nine-millimeter ammunition in Mr. Matthews' bedroom.[50] The officers subsequently arrested Mr. Matthews for only the PABPP charge.[51] Six months later, a grand jury returned an indictment against Mr. Matthews that joined the PABPP charge with new charges for Murder in the First Degree, PFDCF, and PFBPP.[52] With agreement from the State and Mr. Matthews' trial counsel, the Court ordered the person-prohibited charges to be tried separately from the murder charge.[53]

According to Mr. Matthews, "[u]n-linking the two cases prejudiced [him] because it destroyed any hope of using the false [PABPP] arrest report and documents provided to counsel … for impeachment purposes in the murder trial."[54] Specifically, Mr. Matthews takes exception to the PABPP report's indication that he lived with Ms. Johnson on Parma Avenue, instead of his residence in Pennsylvania.[55] Mr. Matthews argues "it was absolutely imperative that the jury heard of the false police report" because the State tied the majority of its evidence to Detective Reid, the author of the PABPP arrest report.[56]

This issue previously arose during a December 2018 scheduling conference.[57]

---

[50] *See* D.I. 1 (Initial Crime Report for Compl. No. 32-17-122020).
[51] *See id.*
[52] *See* Shaheed Matthews Indictment ¶ 1.
[53] *See* D.I. 19. The Court "unlinked" the PABPP charge and severed the PFBPP charge.
[54] Matthews Mem. at 9.
[55] *See* Matthews Mem. at 8-9.
[56] Matthews Mem. at 11-12.
[57] *See* Scheduling Conference Tr. 12-18, Dec. 18, 2018.

At the conference, Mr. Matthews complained trial counsel did not intend to use documentation obtained from his Pennsylvania probation officer during the murder trial.[58]  Mr. Matthews argued trial counsel should have used the documentation to: (1) impeach Detective Reid and (2) prove Mr. Matthews lived in Pennsylvania at the time of the murder, instead of Parma Avenue.  Trial counsel responded: "[I]t is absolutely correct that I told him that … it wouldn't be in [his] best interest to bring in a probation officer to testify that [he was] living [in Pennsylvania] when upon cross examination the reason that you're involved with that probation officer is a gun charge."[59]

The Court is satisfied trial counsel made a reasonable strategic decision to minimize Mr. Matthews' connections to firearms by severing the person-prohibited charges.  As the Delaware Supreme Court recently announced in *Justiniano v. State*,[60] "[t]he purpose of severance in person-prohibited cases is to prevent a jury from inferring a criminal disposition based on a defendant's criminal history."[61]

Further, confronting Detective Reid with his report would have yielded minimal (if any) impeachment value for Mr. Matthews.  After the murder, Ms. Johnson told police Mr. Matthews had lived with her at the Parma Avenue residence

---

[58] *See* Scheduling Conference Tr. 14-16.
[59] Scheduling Conference Tr. 18.
[60] 2018 WL 2072816 (Del. May 2, 2018).
[61] *Id.* at *2.

"on and off" for two years,[62] and Mr. Matthews admitted he was at the Parma Avenue residence on the night of the murder.[63]  Thus, whether Mr. Matthews legally resided in Pennsylvania at the time of the PABPP arrest is of no significance to this case.

In sum, the Court finds the PABPP report error would not have made a difference at trial.  Trial counsel reasonably pursued a strategy to avoid mention of Mr. Matthews' history with firearms, and Mr. Matthews has failed to produce sufficient evidence to undermine confidence in the basis of this decision.  Therefore, the claim is denied.

### c. Trial Counsel Was Not Deficient in Failing to Call Detective Smith to Testify About a Statement in His Police Report

Next, Mr. Matthews argues trial counsel was ineffective for failing to call and question Detective Joshuah Smith about an allegedly false statement in his police report.[64]

In his supplemental police report, Detective Smith wrote: "[Ms. Johnson]

---

[62] Johnson Int. Tr. (Dec. 29, 2017) at 6-7.
[63] *See generally* Matthews Int. Tr. (Dec. 28, 2017).  Mr. Matthews argues this piece of evidence, taken with Detective Reid's statement in his report that a video depicted two individuals engaged in an altercation, bolsters the credibility challenge against Detective Reid.  This is nonsensical.  First, trial counsel sufficiently cross-examined Detective Reid on whether the video showed two people in an altercation.  Second, any doubts of Detective Reid's credibility based on the report are (at best) speculative.  Third and finally, it is clear trial counsel balanced the benefit of using this "impeachment material" against the risk associated with the jury hearing Mr. Matthews was a person prohibited from possessing firearms and made a strategic trial decision to not use it.  This is exactly the type of decision the Court will not overturn in hindsight.
[64] *See* Matthews Mem. at 12-15.

stated she picked up [Mr. Matthews] in the area of the 'trashcans' described as the area known as Parma and Bizarre." Mr. Matthews acknowledged this statement put him in the direct vicinity of the shooting,[65] but argued other available evidence contradicted it.[66] According to Mr. Matthews, the inclusion of this "false" statement in the report constituted malicious prosecution, and trial counsel should have used the statement to impeach the credibility of the investigating officers.[67]

This argument defies logic. For one, the report explicitly couches the summary as statements Ms. Johnson made, rather than independently proven facts.[68] And, as Mr. Matthews admits, Ms. Johnson *did* tell detectives she picked up Mr. Matthews near the trashcans:

> [Detective Reid]: Okay? What I'm really interested in is you – you said you picked up [Mr. Matthews] at the corner, where – where is – where – where at?
>
> [Ms. Johnson]: Almost to the corner right where the trashcans are.[69]

Because the statement in the report was not false, trial counsel could not have used it as a basis to impeach the credibility of the investigators. Thus, the Court is satisfied trial counsel's decision to not call Detective Smith as a defense witness was

---

[65] *See* Matthews Mem. at 13.
[66] *See* Matthews Mem. at 13-15.
[67] Matthews Mem. at 15.
[68] *See* Detective Smith's Feb. 2, 2018 Supplemental Report for Compl. No. 32-17-121392, at 006.
[69] Johnson Int. Tr. at 34.

a reasonable one, and Mr. Matthews did not suffer prejudice as a result of it. This claim is denied.

### d. Trial Counsel Was Not Deficient in Handling the Cell Phone Evidence

At trial, the State admitted internet searches and text messages that suggested Mr. Matthews shopped for a firearm in the days before the murder.[70] Mr. Matthews' phone contained searches for "Ruger 45" and "Ruger P97" (a brand and calibers of firearms) in the days leading up to the shooting.[71] Additionally, a week before the murder, Mr. Matthews texted an unknown individual, "how much."[72] The person replied, "450" with a picture of an item with the logo of Taurus, a firearm manufacturer, on it.[73] Mr. Matthews responded, "That's too much."[74]

The State also introduced a text conversation between Mr. Matthews and Ms. Johnson the day after the murder.[75] In the conversation, Ms. Johnson wrote to Mr. Matthews, "I love you so much and I can't lose you" and "[c]hanges have to be made now."[76] Ms. Johnson testified she was expressing fear she may lose Mr. Matthews to violence;[77] however, after the murder, Ms. Johnson told police the comment was

---

[70] *See* Trial Tr. 78-83, Apr. 12, 2019.
[71] Trial Tr. 80, Apr. 12, 2019. These internet searches had been deleted before Mr. Matthews turned over his phone to police, but officers were able to recover them.
[72] Trial Tr. 82-83, Apr. 12, 2019.
[73] Trial Tr. 82-83, Apr. 12, 2019.
[74] Trial Tr. 83, Apr. 12, 2019.
[75] *See* Trial Tr. 38-41, Apr. 10, 2019.
[76] Trial Tr. 154, Apr. 10, 2019; *see also* Trial Tr. 39, Apr. 15, 2019.
[77] *See* Trial Tr. 154-155, Apr. 10, 2019.

about troubles in their relationship.[78]  The State used these messages to question when and how Ms. Johnson learned of Mr. Terry's murder.[79]

In his motion, Mr. Matthews argues: (1) trial counsel rendered ineffective assistance by failing to challenge the cell phone search warrant in a motion to suppress, and (2) even if the cell phone evidence was admissible, trial counsel was ineffective in preparing to address the evidence at trial.  The Court will address each claim individually.

### 1. *The Motion to Suppress*

Mr. Matthews first contends the police downloaded the contents of his phone under a general warrant, in violation of the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution.[80]  He argues the search warrant must have lacked probable cause, particularity, and a nexus between the crime and his phone because the police could not have developed probable cause given the facts known at the time of the search.[81]

Trial counsel disagrees.  In his Rule 61 affidavit, trial counsel notes he objected to certain portions of the cell phone evidence.[82]  He did not, however, see a basis for excluding the cell phone evidence as a whole.[83]  For the following reasons,

---

[78] *See* Trial Tr. 157-158, Apr. 10, 2019.
[79] *See* Trial Tr. 38-39, Apr. 15, 2019.
[80] *See* Matthews Mem. at 17-18.
[81] *See* Matthews Mem. at 17-20.
[82] *See* Trial Counsel Aff. at 3.
[83] *See id.*

17

the Court must side with trial counsel.

## I.    *The Particularity Requirement*

The United States Constitution "specifies only two matters that must be 'particularly describe[ed] in warrant: 'the place to be searched' and the persons or things to be seized.'"[84]    However, given the unprecedented volume of private information stored on electronic devices, warrants directed to digital information present unique challenges in satisfying the Fourth Amendment particularity requirement.[85]

The United States Supreme Court articulated this complexity in *Riley v. California*.[86]    In considering a warrantless search of a cell phone, the *Riley* Court observed that, much like a computer search, "[a cell] phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form…."[87] Thus, as *Riley* observed, top-to-bottom digital searches permit the government access to "far *more* than the most exhaustive search of a house."[88]

Although the Delaware Supreme Court has hesitated to prescribe rigid rules governing cell phone search warrants, the Court did outline the minimum

---

[84] *United States v. Grubbs*, 547 U.S. 90, 97, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (alteration in original).
[85] *See Wheeler v. State*, 135 A.3d 282, 299 (Del. 2016).
[86] --- U.S. ----, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).
[87] *Id.* at 2491.
[88] *Id.* (emphasis in original).

requirements to procure such a warrant in *State v. Wheeler*:[89]

> Federal Courts of Appeal have concluded that warrants lacking temporal constraints, where relevant dates are available to the police, are insufficiently particular. . . . Striking the correct balance when protecting against generality and overbreadth requires vigilance on the part of the judicial officers who are on the front lines of preserving constitutional rights while assisting government officials in the legitimate pursuit of prosecuting criminal activity. Where . . . the investigators had available to them a more precise description of the alleged criminal activity that is the subject of the warrant, such information should be included in the instrument and the search and seizure should be appropriately narrowed to the relevant time period so as to mitigate the potential for unconstitutional exploratory rummaging.[90]

As mentioned above and discussed below, Mr. Matthews argues the search warrant for his cell phone was an unconstitutional general warrant. His concern bears scrutiny.

In its warrant application, the police requested to perform a "forensic examination" on "any and all" digital contents of Mr. Matthews' cell phone.[91] This examination broadly "include[d] but [was] not limited to call logs, SMS (text) messages, MMS (media) messages, internet browsing history, images and/or videos, any and all information that may identify suspects and/or co-conspirators, [and] any

---

[89] 135 A.3d 282.
[90] *See id.* at 306.
[91] Detective Rau's December 29, 2017 Application and Affidavit in Support of Search Warrant for Contents of Shaheed Matthews' Cell Phone, Compl. No. 32-17-121392 (hereinafter "Rau Warrant") at 02.

and all information related to the crime….”[92]

The Court agrees with Mr. Matthews that the warrant application itself is void of the temporal constraints prescribed by *Wheeler*. As an illustration, the affidavit states Mr. Terry allegedly shot Mr. Matthews' girlfriend two years ago.[93] The application, however, makes no effort to limit the search back to the date of the alleged shooting.

*Wheeler* recognizes that a warrant – no matter its target – must both "describe the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based."[94] The State has failed to argue, much less argue convincingly, the cell phone warrant satisfied this particularity requirement. Because of this, the Court finds the cell phone warrant to be a general warrant – that scrouge of executive overreach "abhorred by the colonists" that permitted "a general, exploratory rummaging in a person's belongings"[95] for vaguely-defined categories of contraband.[96]

## II.    *Voluntary Consent*

The validity of the search warrant notwithstanding, Mr. Matthews provided

---

[92] *Id.*
[93] *See id.* at 2. The Court presumes the authoring officer included this allegation in the affidavit to provide the issuing magistrate with Mr. Matthews' motive for the shooting.
[94] *Wheeler*, 135 A.2d at 299.
[95] *Id.* at 296 (internal citations omitted).
[96] *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.).

police with an independent basis to search his phone when he consented to the search.

In *Scott v. State*,[97] the Delaware Supreme Court held searches conducted pursuant to "valid consent" are excepted from the Fourth Amendment warrant requirement.[98] The *Scott* Court found consent to be "valid" when it is voluntarily offered by a person with authority to do so.[99]

In this case, police visited Mr. Matthews after learning he was with Mr. Terry on the night of the murder. The officers asked Mr. Matthews for his contact information, and Mr. Matthews stated he did not own a cell phone.[100] Later in the conversation, however, Mr. Matthews told police he and Mr. Terry exchanged text messages the night of the murder.[101] When reminded that he claimed not to own a cell phone, Mr. Matthews admitted to owning a phone but explained he did not want to "give the number out."[102] In response, an officer told Mr. Matthews he was being "funny" about his cell phone and cell phone number.[103] Mr. Matthews then offered to provide his phone to police.[104]

The officers accepted this offer. It bears mention that Mr. Matthews made the

---

[97] 672 A.2d 550, 552 (Del. 1996). The *Scott* Court, in essence, articulated the holding of the United States Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 221-22 (1973).
[98] See *id.*
[99] *Id.*
[100] *See* Matthews Int. Tr. at 1.
[101] *See* Matthews Int. Tr. at 7-8.
[102] Matthews Int. Tr. at 8.
[103] Matthews Int. Tr. at 12.
[104] *See* Matthews Int. Tr. at 12. Specifically, Mr. Matthews told the officer "[Y]ou can have it."

offer *before* officers notified him they had already obtained a warrant for the phone.[105] Subsequently, police told Mr. Matthews they planned to connect the phone to a computer and "dump the contents of it."[106] Mr. Matthews agreed to this proposal and offered to retrieve his phone from his brother's house for the police.[107] He suggested the officers follow him to the house and volunteered his phone's passcode to them.[108]

As the owner of the phone, Mr. Matthews possessed authority to give consent. He clearly did so voluntarily. Mr. Matthews spoke with police at Ms. Johnson's residence on Parma Avenue – not at police headquarters or a similar custodial setting. At no point during the conversation was Mr. Matthews taken into custody; in fact, officers encouraged Mr. Matthews to leave so he could retrieve the cell phone. He initiated consent without prompting and unaware of the search warrant officers had already obtained. Even after learning officers planned to "dump" his phone, Mr. Matthews did not withdraw or limit his consent.

Recently, this Court confronted a similar factual scenario in *State v. Blackwood*.[109] In sum, officers in *Blackwood* obtained an overly broad warrant to search the defendant's cell phone.[110] Nevertheless, police also obtained the

---

[105] *See generally* Matthews Int. Tr. at 1-12.
[106] Matthews Int. Tr. at 12.
[107] *See* Matthews Int. Tr. at 13.
[108] Rau Warrant at 5-6 ¶ 10.
[109] 2020 WL 975465, at *6-7 (Del. Super. Feb. 27, 2020).
[110] *See id.* at *3-5.

22

defendant's consent to search the cell phone.[111]  The *Blackwood* defendant: (1) confirmed the seized phone belonged to him; (2) told police they would find alibi information on the phone; (3) volunteered the phone's passcode; and (4) physically unlocked the phone for police.[112]  In its final analysis, *Blackwood* concluded the defendant was not coerced and appeared "willing to cooperate with the police of a desire to prove his innocence."[113]

Here, as in *Blackwood*, Mr. Matthews was cooperative with police.[114]  He volunteered his phone to the officers and helped them access it, knowing they intended to download its entire contents.  In light of this consent, a motion to suppress based on defects in the search warrant would have been futile.  Trial counsel did not perform deficiently by failing to file one.

### III.    Actual Prejudice

Further, even if the consent was defective, the cell phone evidence had no bearing on the outcome of the case.  The State submitted the evidence to prove Mr. Matthews' intent, but the surveillance video showing the suspect chasing down and shooting Mr. Terry from behind more than adequately proved that element of the crime.  The video evidence, combined with Ms. Johnson's statements, leaves the

---

[111] *See id.* at *6-7.
[112] *See id.* at *6.
[113] *Id.*
[114] Whether this cooperation stemmed from Mr. Matthews' belief that police would not find the deleted searches for firearms is not for the Court to say.

Court with no room to reasonably conclude anyone other than Mr. Matthews could have been the shooter.

To review, three people were together at 227 Parma Avenue on the night of the murder: Mr. Matthews, Mr. Terry, and Ms. Johnson. Each of the three left the residence at around 10:30 p.m. According to Ms. Johnson, Mr. Matthews and Mr. Terry left first.

The 19 Briarcliff footage confirms Ms. Johnson's version of events. As noted *supra*, it shows two people leave 227 Parma Avenue together, walk southeast along Parma Avenue, stop at the edge of the frame, and get into a fight before continuing in the same direction. The 241 Parma video picks up approximately seven seconds later, showing a person in a hooded jacket and black sneakers chase Mr. Terry southeast on Parma Avenue, shoot him, and flee northeast through a cut between the blocks of townhomes. A few minutes after the shooting, Mr. Matthews called Ms. Johnson and requested she pick him up a few blocks northeast of the shooting scene. Immediately after the call, the cameras capture a third person leave 227 Parma Avenue and Ms. Johnson's vehicle travel towards Mr. Matthews' location. The footage does not reveal anyone else traveling from the area of 227 Parma Avenue to Mr. Matthews' location during this time.

Indeed, Ms. Johnson did pick Mr. Matthews up from a location in the same direction the shooter fled. Shortly thereafter, police seized a hooded jacket and

24

sneakers from Mr. Matthews that matched the suspect's clothing in the 241 Parma video. The right cuff of the jacket tested positive for gunshot residue.

The State's case was strong. That is so, even without the cell phone evidence. The Court thereby finds Mr. Matthews suffered no actual prejudice from the admission of the phone activity. This claim is denied.

### 2. The Handling of the Cell Phone Evidence in Trial

Mr. Matthews next submits that even if the cell phone evidence was admissible, trial counsel was unprepared to rebut or impeach it. The Court examines each claim related to the phone evidence in turn.

### I. The Trial Strategy

In sum, this claim arises from the sidebar discussion of trial counsel's objection to the firearm-related cell phone evidence.[115] At trial, counsel for Mr. Matthews informed the Court he had received substantial productions from the State "at the tail end of the discovery."[116] Although the State identified the cell phone evidence as a possible trial exhibit, a miscommunication with prosecutors led trial counsel to assume the State would also flag any evidence it intended to admit under Delaware Rule of Evidence 404(b).[117] Operating under this assumption, trial counsel believed that because the State did not flag the firearm messages as 404(b) evidence,

---

[115] *See* Trial Tr. 143-52, Apr. 11, 2019; Trial Tr. 19-50, Apr. 12, 2019.
[116] Trial Tr. 49, Apr. 12, 2019.
[117] *See* Trial Tr. 33-34, Apr. 12, 2019.

25

it would redact those messages from the exhibits or otherwise not seek to admit them.[118]  As trial counsel stated, "[M]aybe that was my mistake in assuming."[119]

Nevertheless, trial counsel still timely objected to the firearm-related cell phone evidence under 404(b).[120]  Counsel stated that if he knew the State would introduce the evidence, he "possibly" would have altered the defense theory and argued Mr. Matthews was someone "into firearms" to explain the gunshot residue on his jacket.[121]  This Court overruled the objection.

Based on this exchange, Mr. Matthews argues trial counsel dismissed the cell phone evidence out of hand and was unprepared to rebut the meaning of the text conversation between he and Ms. Johnson, the implication that his phone history showed no remorse or sadness over Mr. Terry's murder, and the importance of the searches and text messages about a possible firearm purchase.[122]

Then, in what is almost stream of consciousness, Mr. Matthews offers a string of things trial counsel could have done had he devised a proper strategy: (1) shown Mr. Matthews and Ms. Johnson were discussing their relationship problems; (2) found social media messages expressing pain over Mr. Terry's death; (3) argued the firearms Mr. Matthews sought were different in caliber from the murder weapon; (4)

---

[118] *See* Trial Tr. 24, Apr. 12, 2019.
[119] Trial Tr. 24, Apr. 12, 2019.
[120] *See* Trial Tr. 35-36, Apr. 12, 2019.
[121] Trial Tr. 149, Apr. 11, 2019.
[122] *See* Matthews Mem. at 21.

discovered Mr. Matthews and Mr. Terry were searching for firearms together because Mr. Terry received death threats; (5) uncovered Mr. Matthews searched for firearms just "to see what [they] looked like"; and (6) discovered Mr. Matthews deleted the entire search history from his phone because it included pornography.[123]

The Court is skeptical trial counsel's strategy would have changed based on the miscommunication with the State. It would have been against the interest of Mr. Matthews for trial counsel to present him – a person prohibited from possessing firearms – as someone who was "into firearms." Further, trial counsel did, in fact, address many of the issues at trial similarly to how Mr. Matthews suggests he should have.

For example, trial counsel *did* argue the text conversation between Mr. Matthews and Ms. Johnson concerned problems in their romantic relationship.[124] Had trial counsel introduced more of the conversation, however, he would have contradicted the trial testimony of Ms. Johnson, who told the jury the conversation was about her concern she may lose Mr. Matthews to violence after learning of Mr. Terry's death.[125]

Furthermore, trial counsel relayed to the jury that Mr. Matthews deleted more than just the firearm searches from his cell phone history and never possessed the

---

[123] Matthews Mem. at 26-27.
[124] *See* Trial Tr. 62-63, Apr. 15, 2019.
[125] *See* Trial Tr. 154-155, Apr. 10, 2019.

firearms he searched for.[126] As trial counsel stated during closing arguments, "[T]he text messages about Mr. Matthews inquiring about a firearm, [they] actually show[] you he didn't buy it."[127] The additional avenues Mr. Matthews suggests trial counsel should have explored would have provided marginal additional value, as the State presented the texts and searches to show preparation and intent – not to specifically identify the murder weapon.

## II.    The Social Media Posts

Next, Mr. Matthews takes issue with trial counsel's failure to use his social media posts to rebut the State's implication that he did not show emotion upon learning of Mr. Terry's death.[128] This argument fails for two reasons.

First, the posts would have been inadmissible at trial. Delaware Rule of Evidence 801(d)(2) excepts hearsay statements made by *party opponents*.[129] Mr. Matthews faults trial counsel for not introducing the posts, but the posts clearly would not fit into the party-opponent exception unless offered by the State.[130]

Moreover, even if it were proper to consider the social media, the argument would still fail because the posts did not rebut the State's evidence. As the State argued in closing, the cell phone evidence revealed Mr. Matthews did not attempt to

---

[126] *See* Trial Tr. 56-57, Apr. 15, 2019.
[127] Trial Tr. 57, Apr. 15, 2019.
[128] *See* Matthews Mem. at 22.
[129] *See* D.R.E. 801(d)(2) (emphasis added).
[130] *See generally id.*

determine if Mr. Terry was safe, despite learning of a shooting outside his girlfriend's home. Implicit in this argument was not that Mr. Matthews lacked remorse, but rather, that he lacked ignorance. Mr. Matthews did not need to investigate Mr. Terry's well-being because he knew Mr. Terry was already dead.

Mr. Matthews has not persuasively disputed this point. Therefore, his argument is rejected.

### III.     *The Decision Not to Testify*

Finally, Mr. Matthews argues he would have chosen to testify in his own defense had trial counsel performed differently. Once again, the record evidence proves fatal to his claim.

The decision on whether to testify ultimately belongs to the defendant, not his trial counsel.[131] If the defendant waives the right to testify after appropriate colloquy with the Court, then the defendant's own decision precludes a finding of cause or prejudice under *Strickland* and its progeny.[132] The record clearly establishes the Court conducted a waiver colloquy with Mr. Matthews and determined his decision not to testify was knowing and voluntary:

> THE COURT: Do you understand that you have a constitutional right to testify or not testify in this trial?
>
> MR. MATTHEWS: Yes.

---

[131] *See Erkskine v. State*, 2013 WL 1919121, at *2 (Del. May 7, 2013).
[132] *See id.*; *see also State v. Taye*, 2014 WL 785033, at *5 (Del. Super. Feb 26, 2014).

29

THE COURT: Do you understand that your attorney and maybe family members can advise you one way or the other, but, in the final analysis, this is a right, or rather a decision, that only you can make. Do you understand that?

MR. MATTHEWS: Yes.

THE COURT: Do you understand that if you exercise your constitutional right not to testify, I will instruct the jury that you have a constitutional right not to testify, and that that decision cannot be held against you?

MR. MATTHEWS: Yes.

THE COURT: Do you believe that you have had enough time to confer about this with your attorney?

MR. MATTHEWS: Yes.

THE COURT: Do you understand that this decision is a final decision, meaning you will not be able to come back at some later time and say that you really did wish to testify, but didn't realize you had to make the decision right here and now? This will be a final decision. Do you understand that?

MR. MATTHEWS: Yes.

THE COURT: Do you believe you are knowingly, voluntarily, and intelligently . . . waiving your right to testify in this trial?

MR. MATTHEWS: Yes.

THE COURT: [Trial counsel], I meant to ask you this before I started discussing it. Do you believe you've had ample time to discuss the pros and cons of testifying with your client?

[TRIAL COUNSEL]: Yes, Your Honor. Just to set a record, we had spoken about it previously in passing and putting strategy together whether or not he would or wouldn't. I spoke with him uniquely on that situation yesterday for a long period of time after we adjourned here yesterday until the Department of Corrections had to take him back. And then I also spoke with him today during the entire lunch period. Well, I spoke with his family briefly at the beginning of the lunch period, and then used the rest of that time to speak with him on the matter. And I feel as though, yes, we went over all the pros and cons. We went through a lot of information. And I believe that we've discussed it appropriately.

THE COURT: Thank you. So I'll just ask the question again, since there's a little bit of further factual background with [trial counsel]'s comments. Do you believe you are knowingly, voluntarily, and intelligently waiving your constitutional right to testify?

MR. MATTHEWS: Yes.

THE COURT: I find that Mr. Matthews has knowingly, voluntarily, and intelligently waived his constitutional right to testify.[133]

Of note, this colloquy took place *after* the State admitted the cell phone evidence

---

[133] Trial Tr. 168-71, Apr. 12, 2019.

and Mr. Matthews offered his purported explanations for the phone activity. Faced with this information, Mr. Matthews still chose to waive his right to testify. The Court will not attribute the strategic consequences of his own decision to trial counsel under these circumstances. This claim is denied.

## B. The Ineffective Assistance Claims Against Appellate Counsel
### a. The Prosecutorial Misconduct Claim on Appeal

Mr. Matthews next directs his ire towards appellate counsel. In his first argument, he claims the prosecutor misled this Court during a sidebar and faults appellate counsel for not raising a claim of prosecutorial misconduct based on the alleged deceit.[134]

During the cross examination of Detective Reid at trial, Mr. Matthews' trial counsel asked, "And you're aware that nothing found at 227 Parma Avenue links Shaheed Matthews to the death of Antoine Terry, correct?"[135] Detective Reid hesitated to answer, prompting the prosecutor to request a sidebar conference.[136] At sidebar, the prosecutor and the Court had the following exchange:

> THE COURT: The Detective obviously hesitated in answering the question.
>
> [THE PROSECUTOR]: Correct, Your Honor. That's why I asked for the sidebar. The Detective was instructed by [the prosecutors] to not make reference to the ammunition

---

[134] *See* Matthews Mem. at 27-30.
[135] Trial Tr. 118-19, Apr. 12, 2019
[136] *See* Trial Tr. 119, Apr. 12, 2019.

found at 227 Parma Avenue. The ammunition is 9-millimeter. The ballistics expert testified yesterday that the deformed projectiles could have been fired from a 9-millimeter. When he was answering [trial counsel]'s questions, I'm assuming Detective Reid's hesitation was that, in answering the question honestly, he may very well say "not true" and say something we told him not to say.[137]

Indeed, the State's ballistics expert testified the previous day:

[THE PROSECUTOR]: You indicate that Items 1 and 2 [the projectiles recovered from the scene of Mr. Terry's murder] would be the .38 caliber?

[THE EXPERT]: Well, they're .38 caliber class. A .38 caliber class includes several cartridge designations. When I say .38 caliber, I'm basically referring to the diameter of the bullet. Okay. Now, that can include all of your 9-millimeters, .380's, your .38's, and .357 magnums. They're all very close in diameter. So, therefore, I just give it a caliber class.[138]

Noticing his question to Detective Reid risked opening the door, trial counsel rephrased and asked a more pointed question: "Detective, when the officers searched 227 Parma Avenue, there was no firearm found related to [Mr. Matthews]?"[139] Detective Reid agreed.[140]

Essentially, Mr. Matthews' argument boils down to an erroneous claim that, as a matter of science, the bullets taken from Mr. Terry's body could not have been

---

[137] Trial Tr. 119, Apr. 12, 2019.
[138] Trial Tr. 136, Apr. 11, 2019.
[139] Trial Tr. 121, Apr. 12, 2019.
[140] *See* Trial Tr. 121, Apr. 12, 2019.

the nine-millimeter bullets seized from his bedroom on Parma Avenue.[141] He concludes the sudden sidebar on this subject prejudiced him in front of the jury because it indicated police did find evidence inside 227 Parma Avenue that tied him to the murder.[142]

The Court will not address Mr. Matthews' borderline-incoherent interpretation of the State's evidence collection procedures, other than to say it is plainly incorrect. Mr. Matthews does not allege – nor could he – any other basis to conclude the prosecutor was deceitful at sidebar.[143]

The first step in analyzing any claim of prosecutorial misconduct is determining whether any misconduct occurred.[144] If not, the analysis ends.[145] Against this background, it is abundantly clear from the record no prosecutorial misconduct occurred. In fact, the prosecutor requested the sidebar conference so as to *avoid* prosecutorial error. Had appellate counsel raised this claim on appeal, the Delaware Supreme Court's analysis would have ended at the first step. Appellate counsel did not perform deficiently by failing to do so, and Mr. Matthews suffered no prejudice as a result. This claim is denied.

---

[141] *See* Matthews Mem. at 28-29.
[142] *See* Matthews Mem. at 30.
[143] The Court notes the sidebar conference was actually *helpful* to Mr. Matthews. Had Detective Reid answered the question honestly, he would have revealed there was, in fact, evidence found at Parma Avenue that linked Mr. Matthews to the murder.
[144] *See Baker v. State*, 906 A.2d 139, 150 (Del. 2006).
[145] *See id.*

## b. The Failure to Challenge the Reenactment Video on Appeal

In his final ground for postconviction relief, Mr. Matthews claims appellate counsel rendered ineffective assistance by failing to challenge the admission of a reenactment video depicting the shooting on appeal. Not so.

By way of background, the police seized a pair of black Nike Air Force 1 sneakers and a blue H&M hooded winter jacket from Mr. Matthews at the time of his arrest.[146] When officers examined the jacket, they noticed its dark-blue color would turn light-gray under infrared light – the same type of light used in the surveillance footage discussed *supra*.[147] The sneakers still appeared black under the light.[148] In the surveillance footage, the shooter appeared to wear a light-gray hooded jacket and black shoes.[149] With this in mind, the officers created a reenactment video to determine if the dark-blue jacket matched the clothing worn by the shooter in the surveillance footage.[150]

Mr. Matthews brings three problems with the reenactment video to the Court's attention: (1) the video was a "scientific comparison" submitted without proper foundation because the officers who created the video were not experts in crime-scene reenactment; (2) the prosecutor misrepresented to the Court that "he had

---

[146] *See* Trial Tr. 66-67, Apr. 9, 2019.
[147] *See* Trial Tr. 154, Apr. 11, 2019.
[148] *Id.*
[149] *See* Trial Tr. 154-55, Apr. 11, 2019.
[150] Trial Tr. 155, Apr. 11, 2019.

federal case law supporting what the investigating detectives did in the video reenactment" when, according to Mr. Matthews, "there are no federal cases, to [his] knowledge, that support a[n] officer removing what was considered evidence from the police station, transport[ing] it back to the crime scene and us[ing] the physical evidence to conduct a reenactment"; and (3) the use of his clothing in the video contaminated evidence, as it was *the officers in the video* who must have placed the gunshot residue on his jacket.[151]  Mr. Matthews is confident his appeal would have been successful had appellate counsel raised the above issues.[152]

With Mr. Matthews' argument thusly framed, the Court evaluates each claim independently.

### 1. The "Scientific Comparison"

Although a video reenactment is experimental evidence, it is not necessarily "expert" evidence.[153]  Expert testimony refers to testimony based on scientific, technical, or other specialized knowledge.[154]  Lay testimony, on the other hand, is testimony based on perception.[155]  The Delaware Supreme Court recently distinguished the two in *Jackson v. State*.[156]

---

[151] Matthews Mem. at 30-33.
[152] *See* Matthews Mem. at 30-33.
[153] *See, e.g., United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005) ("The video reenactment, made for the purpose of demonstrating that [the defendant] was physically capable of unzipping his pants while allegedly bound in his car, is a form of experimental evidence.").
[154] *See* D.R.E. 702(a).
[155] *See* D.R.E. 701(a).
[156] *See* 2018 WL 936845, at *3.

In *Jackson*, a police officer identified a hole in a window as a bullet hole at trial, even though he could not locate the bullet because the projectile took an "unpredictable" path.[157] Although the officer based his opinion (at least in part) on his experience and work in law enforcement, the *Jackson* Court explained the testimony was not expert evidence because it "was based on [the officer]'s rational perception of something he personally observed."[158]

Similarly, in this case, the officers did not perform an experiment that required specialized knowledge. Rather, the police made a reenactment video to see if Mr. Matthews' dark-blue jacket would appear light gray on the surveillance cameras. The basis for the reenactment video was the officers' own perception.

Moreover, in recognition of the "gray area" between expert and experimental evidence, federal courts have developed a separate standard for judging the admissibility of reenactment evidence. Simply put, if the reenactment does not involve scientific or otherwise specialized knowledge, the courts inquire into whether officers conducted the reenactment under conditions "substantially similar" to the actual event.[159]

Out of an abundance of caution, the police in this case took numerous steps to

---

[157] *See id.*
[158] *Id.*
[159] *See*, *e.g.*, *United States v. Jackson*, 479 F.3d 485, 498 (7th Cir. 2007); *Baldwin*, 418 F.3d at 579-80; *United States v. Birch*, 39 F.3d 1089, 1092 (10th Cir. 1994); *Norton v. Frohnmayer*, 1991 WL 279021, at *2 (9th Cir. Dec. 26, 1991).

ensure they created the reenactment video under substantially similar conditions to the footage from the night of Mr. Terry's murder. First, the officers used the same home surveillance camera from 241 Parma Avenue that originally captured the shooting.[160] Second, the officers mimicked the natural lighting by performing the reenactment under the same moon phase.[161] Third, the police ensured the weather conditions were similarly clear and dry.[162] Fourth and finally, the officers ensured the same cars were parked on the street.[163]

Because the conditions in the reenactment video were substantially similar to the surveillance footage, the State was not required to provide expert qualifications for the officers who created it. The Court properly admitted the video. Mr. Matthews is incorrect.

### 2. The Federal Caselaw

Next, and contrary to Mr. Matthews' claims, there *is* federal precedent for police using actual evidence from a case in reenactment videos.

For example, in *Norton v. Frohnmayer*,[164] officers used the defendant's vehicle, whose splashguard was bent out of position, to reenact the car driving through a ditch at a murder scene.[165] The police realigned the splashguard, drove

---

[160] *See* Trial Tr. 156-59, Apr. 11, 2019.
[161] *See* Trial Tr. 156-59, Apr. 11, 2019.
[162] *See* Trial Tr. 156-59, Apr. 11, 2019.
[163] *See* Trial Tr. 156-59, Apr. 11, 2019.
[164] *See* 1991 WL 279021, at *2.
[165] *See id.*

the vehicle through the ditch, and observed the ditch bent the splashguard out of position in the same way.[166] The United States Court of Appeals for the Ninth Circuit affirmed admission of the video reenactment, finding the conditions of the reenactment substantially similar to the day of the murder.[167]

Likewise, in *United States v. Jones*, the United States Court of Appeals for the Third Circuit upheld admission of a reenactment video where an officer walked through a robbery scene wearing the defendant's shoes.[168] Before *Jones*, in *United States v. Rodriguez*, the Third Circuit affirmed the trial court's decision to admit a bank robbery reenactment that depicted an officer wearing the defendant's red windbreaker to show it could have been the jacket worn in black and white surveillance footage.[169]

The Court will not belabor the point further. Mr. Matthews' claim is rejected.

### 3. The Gunshot Residue

In this final claim, Mr. Matthews' argument sits on a fault line running through his entire motion. Besides treating assumptions as facts, Mr. Matthews repeatedly emphasizes small parts and ignores the whole. Here, he (inaccurately)

---

[166] *See id.*
[167] *See id.*
[168] *See* 737 Fed. App'x 68, 73-74 (3d Cir. 2018).
[169] 54 Fed. App'x 739, 748-49 (3d Cir. 2002).

insists there was a negative test for gunshot residue on his jacket before the positive test.[170]

The first "test" Mr. Matthews refers to was merely a scan by police officers using infrared light.[171] As the officer who scanned the jacket testified, gunshot residue is microscopic and not visible to the naked eye unless clustered in an area.[172] The second test, conducted in a laboratory using a scanning electron microscope, revealed "a population of gunshot residue present on the jacket."[173] This test used samples collected at the time of Mr. Matthews' arrest, weeks before police conducted the reenactment video.[174]

A claim challenging the admission of the reenactment video would not have been successful, and the Court is satisfied appellate counsel did not act deficiently by failing to raise it. Because the claim would not have been successful, there is no reasonable probability the outcome of Mr. Matthews' appeal would have been different. As with the other claims, Mr. Matthews' argument is rejected.

## CONCLUSION

For the foregoing reasons, Mr. Matthews' Motion for Postconviction Relief is **DENIED**.

---

[170] *See* Matthews Mem. at 32-33.
[171] *See* Trial Tr. 85-86, Apr. 9, 2019.
[172] *See* Trial Tr. 85-86, Apr. 9, 2019.
[173] Trial Tr. 74-75, Apr. 11, 2019.
[174] *See* Trial Tr. 66-71, 82-88, Apr. 9, 2019.

**IT IS SO ORDERED**.

/s/ Francis J. Jones, Jr.
Francis J. Jones, Jr., Judge

Original to Prothonotary (Criminal)